Filed 12/8/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B338443 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. XCNA388090-02 |
| v. | |
| ERNEST RONDELL GRANDBERRY, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, William C. Ryan, Judge.  Affirmed.

Michael Reed, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

Ernest Rondell Grandberry appeals from the trial court's order denying his petition under Penal Code section 1172.6[1] for resentencing after an evidentiary hearing.  We conclude substantial evidence supports the court's finding, beyond a reasonable doubt, that Grandberry was a major participant in the felonies underlying the murder, of which he was convicted by plea, who acted with reckless indifference to human life. Accordingly, he is ineligible for relief under section 1172.6. We affirm.

## FACTS AND PROCEDURAL BACKGROUND

### 1. *The charges, plea, and resentencing petition*

Much of the procedural background in this case is set forth in our earlier opinion, *People v. Grandberry* (Mar. 26, 2021, B305238) [nonpub. opn.] (*Grandberry I*).  In a nutshell, in 1983 Grandberry and two codefendants—Bobby Ray Appleberry and Barry Lee Brookins—were charged with the murder of Coleen Hawkins, the attempted murder of Azell Moore, robbery, kidnapping for robbery, forcible oral copulation in concert, and forcible rape in concert.  On April 28, 1983, before the preliminary hearing, all three defendants entered into plea agreements with the People.  Grandberry pleaded guilty to first degree murder, oral copulation in concert, and rape in concert. He also admitted he used a firearm within the meaning of section 12022.5.  In exchange, the prosecution agreed to strike the special circumstance allegations and dismiss the remaining counts.  (*Grandberry I*.)

On June 3, 1983, in accordance with the plea agreement, the court sentenced Grandberry to 27 years to life in the state

---

[1]      References to statutes are to the Penal Code.

2

prison:  25 to life for the murder of Hawkins plus two years for the use of a firearm.  The court imposed the midterm of seven years each on the counts for forcible oral copulation in concert and forcible rape in concert, to be served concurrently with the murder count.  (*Grandberry I*.)

In February 2019, Grandberry filed a petition for resentencing.  Grandberry attached to the petition several documents, including the reporter's transcript of the change of plea, nine pages from the reporter's transcript of the sentencing, and the probation officer's report.  The trial court appointed counsel for Grandberry.  The district attorney filed a response to the petition contending Grandberry "intended to kill and was a 'major participant' who acted with a 'reckless indifference to human life' meeting the newly enacted section 189(e)."  The prosecution cited *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), and then applied the "five-part test" of *Banks* to the facts set forth in the probation report.  (*Grandberry I*.)

In November 2019, Grandberry's court-appointed counsel filed a reply noting Grandberry did not shoot Hawkins or Moore and arguing, in cursory fashion, that under *Banks* and *Clark* "it is not clear . . . [he] was a 'major participant' who acted with a 'reckless indifference to human life.' "  (*Grandberry I*.)

In January 2020, the trial court issued a memorandum of decision denying Grandberry's petition.  The court recited the facts from the probation report and then, citing *Clark* and *In re Loza* (2017) 10 Cal.App.5th 38, 52, listed the "factors to consider in determining whether a perpetrator acted with reckless indifference to human life."  Detailing the facts "as established in the plea transcript," and " 'the record as

3

established in the probation report,' " the court concluded Grandberry was ineligible for relief:

> "Petitioner's acts of robbing Moore at gunpoint and raping and forcibly orally copulating the female victim, clearly show that Petitioner acted with a reckless indifference to human life and was a major participant in the underlying felonies. (§ 189, subd. (e)(3).) Petitioner's actions also illustrate that he, with the intent to kill, aided and abetted the actual killer in the commission of murder in the first degree. (§ 189, subd. (e)(2).) . . . Petitioner would still have been convicted of first degree murder under the amended law." (*Grandberry I*.)

**2.     *Grandberry's appeal and the proceedings on remand***

Grandberry appealed. On appeal, he conceded he was a "major participant" in the underlying felonies. His appeal "focus[ed] on the 'reckless indifference to human life' element." The Attorney General agreed with Grandberry that remand was required. Citing *People v. Drayton* (2020) 47 Cal.App.5th 965, 982, the Attorney General noted the court was not permitted to "weigh the facts without issuing an order to show cause and holding a section 117[2.6], subdivision (d), hearing." As the parties essentially stipulated to a reversal and remand, we reversed the order denying Grandberry's resentencing petition and remanded the case for the trial court to issue an order to show cause and proceed with an evidentiary hearing. (*Grandberry I*.)

4

### 3. *The evidentiary hearing*

After the remittitur issued, on June 11, 2021 the trial court issued an order to show cause. In anticipation of the evidentiary hearing, the prosecution submitted several exhibits, including the felony complaint, the reporter's transcript of the change of plea and sentencing, and a transcript of Grandberry's parole hearing in June 2015.[2]

On July 25, 2023, and March 21, 2024, the court conducted an evidentiary hearing.

#### a. *Detective Johnston's testimony*

Retired homicide detective Harold Johnston testified. Johnston had written a report at the time. He'd reread it to prepare for the hearing.

Johnston testified Azell Moore had been shot in the back of the head. Johnston attended the autopsy of Coleen Hawkins; she too had been shot in the back of the head. Johnston interviewed Grandberry twice: on February 16 and again on February 17, 1983. (Johnston Mirandized all three suspects and interviewed them.) Grandberry was 18 at the time, as were Appleberry and Brookins.

In the first interview, Grandberry told Johnston he'd gone to a party at an arcade, got drunk, and slept in his car all night. In the second interview, Grandberry said he, Appleberry, and Brookins were going to "go out and party." Grandberry " 'needed some money.' " The three went to a park, where they came upon

---

[2]     While there are some factual discrepancies among the probation report, Grandberry's statements to Detective Harold Johnston in 1983, and Grandberry's testimony at his parole suitability hearing, none of them is material to our analysis.

a car with two people inside.  Grandberry, Appleberry, and Brookins each had a handgun.

Grandberry went to the driver's side of the victims' car and knocked on the door.  Grandberry "had the man get out of the car at gun point" and put him in the trunk.  Grandberry took the keys out of the car.  Grandberry then got in the front passenger seat, Brookins drove, and Appleberry got in the back seat with Hawkins.  Grandberry told Johnston his intent was to rob the victims.  He admitted to Johnston that he "was a part of" "the kidnapping."

Grandberry told Johnston,

> " 'I got in, you know, talking about, say, man,
> what's happening, man.  All we need is the
> mother fucking car, man.  Fuck all of this shit,
> you know.  They say, no, man, uh, the woman,
> you know, she—she'll keep the police off us
> and shit.  I said, man, but still, man, that's
> a mother fucking kidnap straight off the top,
> you know.  And it was two to one, you know.
> So I just said, fuck it, you know.' "

With Moore in the trunk, Grandberry and his two cohorts started driving around.  Hawkins orally copulated Appleberry in the back seat and then they had intercourse two or three times.  At one point, they stopped the car and Appleberry asked Grandberry if he wanted to have sex with Hawkins, stating, " 'She's pretty good.' "  Grandberry then got into the back seat with Hawkins.  Hawkins orally copulated Grandberry and they had intercourse.  Grandberry told Johnston that Hawkins "was very frightened"—"she wanted to go along hoping to get out of there alive."

Grandberry told Johnston they drove "[a]round the west side of Los Angeles."  "They went by Dimple Clark's house, took a spare tire out of the back of the trunk and left it there."  Clark was Appleberry's aunt.  Then they drove to Hollywood.  At some point, the car stopped and Grandberry "went back to the trunk."  Grandberry knocked on the trunk and asked Moore—whom he referred to as "the homeboy"—how he was.  Moore said he was "okay."  He asked Grandberry "if he was going to get killed" and Grandberry "told him he was not going to get killed."  Moore asked about Hawkins and Grandberry told him "she was okay, and she was not being harmed."

Eventually they stopped near Fremont High School.  Moore was taken out of the trunk and shot in the back of the head.[3]  Grandberry told Johnston that, at some point, Appleberry took Hawkins "out in a lone field in South Los Angeles."  Grandberry heard a shot.  Then Appleberry "returned to the car by himself."

Johnston asked Grandberry, " 'Did you shoot the guy?' "  Grandberry replied, " 'No, I didn't shoot the guy.' "  Grandberry said, " 'I ain't going to say no names because I ain't insinuate [who did what].' "  Apparently referring to Appleberry, Grandberry then said,

> " 'But I look at him.  I don't know.  He say, yeah, homeboy got to go, you know.  She got to go. . . .  And he was saying, yeah, man, she got to go.  Fuck this shit, you know.  And he go like

---

[3]	Johnston testified Grandberry told him it was Appleberry who shot Moore.  Johnston appears to have been mistaken.  The probation report states Brookins admitted he shot Moore and Grandberry also identified Brookins as the shooter in his testimony at his parole hearing.

7

this, you know, winking at me and shit, man. So I figured . . . I guess, you know, just take her somewhere, you know, and tell her to get the fuck out of Dodge . . . .' "

Grandberry told Johnston, " 'I didn't kill nobody.' "

After the shooting, "the three of them kept the car and went back home to Dimple Clark's house." After authorities arrested Appleberry, Johnston was "presented with" a gold watch and a necklace that belonged to Moore. Grandberry told Johnston that they " 'got some more weed from homeboy,' " referring to Moore. Grandberry said, " 'We got him out the trunk,' " and Moore had three or four dollars and two joints. Hawkins had "some change" in her jeans: "altogether it was something like 4, I think $5, you know."

Johnston interviewed Appleberry as well. Appleberry told Johnston he had gone "to the field" with Hawkins alone. " '[T]he other two dudes stayed in the car.' " Appleberry told Hawkins to lie down in the grass. Appleberry told Johnston he " 'was just gonna shoot in the grass' " and tell Hawkins " 'to stay there until the car drove off,' " he was " 'going to let her go,' " but she " 'grabbed at' " him.

b.    *The parole hearing transcripts*

As noted, the prosecution submitted as an exhibit the transcript of Grandberry's parole suitability hearing on June 12, 2015, before the Board of Parole Hearings at Calipatria State Prison. Grandberry was sworn and testified at length about the February 1983 crimes.

The presiding commissioner began the hearing by reading into the record the probation report. According to the report, about 20 minutes after the three perpetrators drove away from

8

the park with the victims in the car, they drove into a garage. Moore was taken from the trunk, told to keep his head down, robbed of his watch, wallet, cash, and a necklace, then ordered back into the trunk.  They drove around for about 90 minutes. The car stopped, Moore was taken from the trunk and told to start walking.  He felt a blow to the back of his head and lost consciousness.  When he came to, he was on the grounds of Fremont High School.  He walked to the street corner and called police.

Hawkins's body was found in a field about 10:30 a.m. Appleberry—apprehended later driving the victims' car— admitted shooting Hawkins.  He implicated Grandberry.

At the parole hearing, Grandberry told the commissioners he and Brookins were at a liquor store.  Brookins said he needed some money and the two talked about committing a "lick"— a robbery.  At some later point, Appleberry "came into the picture."  Grandberry and Brookins got guns from "a stash," and Appleberry got a gun as well.  As the three were "on foot," their first "objective was to get a car" and then to use it to do armed robberies of liquor and grocery stores.

The threesome ended up in Watts where they came across Moore and Hawkins, who were in a car.  Grandberry "tapped on the window with the barrel of [his] gun."  He said "somewhere along the line [of] . . . this is a robbery.  Get out."  Moore got out of the car.  Appleberry and Hawkins were talking about "sex."  Grandberry "argu[ed] with [his] homeboys" about this, as his "objective was to get the car so we could do robberies." Appleberry "had other ideas."  Grandberry "didn't win that particular argument," so they "ended up putting [Moore] in the trunk."  Hawkins was in the back seat.

9

As Grandberry and his cohorts drove around, they were "having a debate" about what to do with Hawkins and Moore. Grandberry said they were "carrying around unnecessary weight" but Appleberry was driving so Grandberry "just . . . rolled with the flow."

They "eventually stop[ped]" in a "very secluded" area in the semi-underground parking of an apartment complex. "[E]verybody was asleep." Moore's belongings were taken from him "immediately." Grandberry went to use the bathroom and then returned to the car. Hawkins orally copulated all three men and then the "vaginal sex occurred."

As they drove around, "the issue came up of witnesses." Grandberry said, "Let's just drop them off, man." Grandberry's "whole thing was, I want to do robberies[,] man." Appleberry was "the one who said, we need to kill the witnesses."

Before returning to Watts, the perpetrators stopped in Fremont. Moore was taken from the trunk and Brookins shot him in the back of the head. Then the threesome went back to Watts, where Appleberry shot Hawkins in a field next to a residential area. Grandberry told the commissioners he was "fully aware" Hawkins was going to be shot. Grandberry was "in the area," "very close" when she was shot. Grandberry, Appleberry, and Brookins then went on to commit robberies of "about three places."

Grandberry told the commissioners he and his cohorts "just need[ed] the car"—they didn't need "to make it worse than it really [was]." But, Grandberry added, "I readily admit that I left that thinking, you know, and I did—I played the role that I played." While he didn't shoot either of the victims, Grandberry

10

said, "I was still there, I was still involved, and I take full responsibility."

On April 26, 2024, the trial court issued a 28-page written opinion denying Grandberry's petition for resentencing. The court found Grandberry was a direct aider and abettor of Appleberry's murder of Hawkins, as well as a major participant in the underlying felonies who acted with reckless indifference to human life.

## DISCUSSION

### 1. *Section 1172.6*

Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) took effect on January 1, 2019. (See Stats. 2018, ch. 1015, § 4.) The bill limited accomplice liability under the felony-murder rule and eliminated the natural and probable consequences doctrine as it relates to murder. (*People v. Gentile* (2020) 10 Cal.5th 830, 842–843 (*Gentile*); *People v. Lewis* (2021) 11 Cal.5th 952, 957 (*Lewis*).) "It amends sections 188, which defines malice, and 189, which defines the degrees of murder to address felony-murder liability, and it adds section [1172.6], which provides a procedure by which those convicted of murder can seek retroactive relief if the changes in the law would affect their previously sustained convictions." (*People v. Gutierrez-Salazar* (2019) 38 Cal.App.5th 411, 417.)

Under the law as amended, a defendant is guilty of murder under a felony-murder theory only if: (1) the defendant was the actual killer; (2) with the intent to kill, the defendant aided or abetted the actual killer in the commission of murder in the first degree; or (3) the defendant was a major participant in the underlying felony and acted with reckless indifference to human life. (§ 189, subd. (e).)

11

Section 1172.6 provides a mechanism by which a person convicted of murder under the former law may be resentenced if he could no longer be convicted of murder because of the changes to sections 188 and 189. (*People v. Strong* (2022) 13 Cal.5th 698, 708; see generally *Gentile, supra*, 10 Cal.5th at p. 843; *Lewis, supra*, 11 Cal.5th at pp. 959–960.) Once a petitioner establishes a prima facie case for relief and the superior court issues an order to show cause, the matter proceeds to an evidentiary hearing. (*Strong*, at pp. 708–709; *People v. Vargas* (2022) 84 Cal.App.5th 943, 951.) The prosecution has the burden at the hearing to prove beyond a reasonable doubt that the petitioner is guilty of murder notwithstanding the amendments to sections 188 and 189. (*Strong*, at pp. 708–709; *Vargas*, at p. 951.)

## 2. *Our standard of review*

While the superior court acts as an independent factfinder in determining whether the People have met their burden, on appeal the reviewing court applies the substantial evidence standard. (*People v. Garrison* (2021) 73 Cal.App.5th 735, 745, 747.) Under this familiar standard, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*Vargas, supra*, 84 Cal.App.5th at p. 951; *People v. Clements* (2022) 75 Cal.App.5th 276, 298.) "We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Edwards* (2013) 57 Cal.4th 658, 715.) In so doing, a reviewing court presumes in support of the judgment the

12

existence of every fact the trier could reasonably deduce from the evidence.  (*People v. Nieber* (2022) 82 Cal.App.5th 458, 476 (*Nieber*); *People v. Owens* (2022) 78 Cal.App.5th 1015, 1022.)  Substantial evidence also includes circumstantial evidence and any reasonable inferences drawn from that evidence.  (*People v. Brooks* (2017) 3 Cal.5th 1, 57; *Nieber*, at p. 476.)

We resolve all evidentiary conflicts and questions of credibility in favor of the judgment.  (*People v. Brady* (2018) 22 Cal.App.5th 1008, 1014, quoting *People v. Cardenas* (2015) 239 Cal.App.4th 220, 226–227.)  We cannot reweigh the evidence or reassess witness credibility on our own.  (*People v. Young* (2005) 34 Cal.4th 1149, 1181 [resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact].)

### 3. *Grandberry's parole hearing testimony was properly admitted*

Grandberry contends the trial court "should not have considered [his] statements taken from the parole hearing because such hearings are inherently coercive in that they require a prisoner to make statements about insights and remorse regarding the life crime."  We review the trial court's ruling on the admissibility of testimony for abuse of discretion.  (*People v. Duran* (2022) 84 Cal.App.5th 920, 927–928 (*Duran*).)  However, "a court abuses its discretion when it misapprehends the pertinent law."  (*Ibid.*)

A number of courts have held parole suitability hearing transcripts and related documents are admissible during evidentiary hearings on post-conviction petitions to vacate murder convictions.  (See *People v. Myles* (2021) 69 Cal.App.5th 688, 692, 694 (*Myles*) [parole hearing transcript showed

13

defendant was the actual killer]; *People v. Anderson* (2022) 78 Cal.App.5th 81, 84, 87–88, 93 (*Anderson*) [parole hearing testimony established defendant was a major participant in underlying robbery who acted with reckless indifference to human life]; *People v. Mitchell* (2022) 81 Cal.App.5th 575, 591–595 (*Mitchell*) [same]; *Duran, supra,* 84 Cal.App.5th at pp. 923–926 [court did not err in considering defendant's statements to psychologist who drafted a risk assessment for parole hearing]; *People v. Rodriguez* (2025) 110 Cal.App.5th 458, 461–462, 464 (*Rodriguez*) [court did not err in considering defendant's letter to parole board and statements to psychologist who prepared risk assessment in concluding defendant was actual killer].)

In *Rodriguez*, we rejected a defendant's argument that "he was compelled to make incriminating statements in his parole proceedings because his silence could be 'injurious' to his chances for parole." (*Rodriguez, supra,* 110 Cal.App.5th at p. 468.) We also joined with other courts that have held the Fifth Amendment privilege against self-incrimination does not apply in a section 1172.6 proceeding, because it is a post-conviction proceeding authorized by the Legislature's act of lenity. (See *Myles, supra,* 69 Cal.App.5th at p. 705; *Anderson, supra,* 78 Cal.App.5th at pp. 89–90; *Mitchell, supra,* 81 Cal.App.5th at pp. 589–590; *Rodriguez,* at p. 468.)

Grandberry acknowledges this weight of authority but says he "advances this position," as the Supreme Court "has yet to decide the issue." Fair enough. However, he also contends his case is different because "the parole board repeatedly stated that [Grandberry]'s history was one of the worst it had seen." Grandberry apparently is referring to the presiding commissioner's comments during a discussion with him

14

about his record, which began with property crimes at age 13 and continued into his time in prison, where he was convicted of assaulting an officer at Folsom. The commissioner told Grandberry, "[Y]ou have one of the worst violent, young histories I've ever seen." He added, "I'm not saying you are today."

Grandberry does not explain why the fact that a prospective parolee has a more serious record than other inmates renders impermissible a court's reliance, in a resentencing proceeding, on his parole hearing testimony. As our colleagues noted in *Mitchell, supra,* 81 Cal.App.5th at p. 590, "[t]he parole process emphasizes the importance of voluntary, unvarnished truthtelling." The *Mitchell* court cited California regulations for parole hearings that provide, " 'The facts of the crime shall be discussed with the prisoner in order to assist in determining the extent of personal culpability.' " (*Ibid.*, citing Cal. Code Regs., tit. 15, § 2236.)

At the same time, the regulations also provide the board " 'shall not' " require an admission of guilt and " 'shall not' " hold an inmate's refusal to discuss the crime against him. (*Mitchell, supra*, 81 Cal.App.5th at p. 590, citing Cal. Code Regs., tit. 15, § 2236.) As in *Rodriguez*, Grandberry "has not demonstrated that his [2015] statements constitute the type of 'compelled testimony' that federal or state constitutions prohibit the prosecution from using to satisfy its burden of proof." (*Rodriguez, supra*, 110 Cal.App.5th at p. 468.)

4. ***Substantial evidence supports the superior court's finding beyond a reasonable doubt that Grandberry is ineligible for relief under section 1172.6***

In the trial court, and again here, Grandberry does not contest the trial court's finding that he was a major participant

15

in the underlying felonies of robbery, kidnapping, and sexual assault.  He contends, however, that the trial court's "finding that [he] acted with reckless indifference to human life is not supported by substantial evidence because it erroneously focused primarily on his failure to intervene at the expense of all the other relevant factors."  He also contends "the court's finding that [his] youth did not factor into his participation in the crimes is not supported by substantial evidence as there was evidence to support both impulsivity and the presence of peer pressure."

"[T]he major participant and reckless indifference concepts trace their origin to a pair of United States Supreme Court decisions"—*Enmund v. Florida* (1982) 458 U.S. 782 and *Tison v. Arizona* (1987) 481 U.S. 137.  (*People v. Emanuel* (2025) 17 Cal.5th 867, 882 (*Emanuel*).)  Years after the United States Supreme Court decided those cases, our Supreme Court—in *Banks*, *supra*, 61 Cal.4th 788 and *Clark*, *supra*, 63 Cal.4th 522 —substantially clarified the "major participant" and "reckless indifference" requirements.

The high court defined reckless indifference to human life as " 'knowingly engaging in criminal activities known to carry a grave risk of death.' "  (*Clark*, *supra*, 63 Cal.4th at p. 616.)  It "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions."  (*Id.* at pp. 616–617.)  Recklessness has both a subjective and an objective component.  (*Id.* at p. 617.)  Subjectively, the defendant must consciously disregard risks known to him.  Objectively, recklessness is determined by "what 'a law-abiding person would observe in the actor's situation,' " that is, whether defendant's conduct " 'involved a gross deviation from the standard of conduct

16

that a law-abiding person in the actor's situation would observe.' " (*Ibid*.)

*Clark* listed factors to consider when determining whether the defendant acted with reckless indifference: "Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he . . . have the opportunity to restrain the crime or aid the victim[s]? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his . . . confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*), citing *Clark*, *supra*, 63 Cal.4th at pp. 618–623.)

In evaluating the sufficiency of evidence to support a trial court's finding that the *Clark* factors are established, no one factor " 'is necessary, nor is any one of them necessarily sufficient.' " (*Clark*, *supra*, 63 Cal.4th at p. 618.) Rather, we evaluate the factors under the totality of the circumstances to determine a petitioner's place on the culpability spectrum. (*Scoggins*, *supra*, 9 Cal.5th at p. 675.) Thus, "[w]here a defendant is not the actual killer or an aider and abettor acting with intent to kill, Senate Bill No. 1437 tasks us to distinguish between defendants who participate in a violent felony posing only the foreseeable risk of death inherent in any such crime (who are not liable for deaths that may occur during its commission) from those who knowingly engage in criminal activities known to carry a grave risk of death (who are liable)." (*Emanuel, supra,* 17 Cal.5th at p. 889.)

17

In its recent *Emanuel* decision, our Supreme Court listed the *Clark* factors in a slightly different order: use of or awareness of the presence of weapons and knowledge of cohort's likelihood of killing; duration of the crime; efforts taken to minimize the risk of violence; and physical presence at the scene and opportunity to restrain confederates or aid victims. (*Emanuel, supra,* 17 Cal.5th at pp. 884–885.) Following our high court's guidance, we address each in turn.

a.   *Grandberry's use of or awareness of the presence of weapons and knowledge of cohort's likelihood of killing*

Grandberry was armed with a gun and so were both of his cohorts. Not only did the robbers possess guns; all three used them. Grandberry used his gun to force Moore into the trunk,[4] and Appleberry and Brookins, respectively, shot Hawkins and Moore.

While the mere fact a robbery involved a gun is insufficient by itself to support a finding of reckless indifference to human life (*Clark*, *supra*, 63 Cal.4th at p. 617), the presence of at least three lethal weapons *and* that they were violently used are factors

_____

[4]   Grandberry cites his statement to Detective Johnston that the gun " 'didn't work.' " Johnston testified he didn't recall Grandberry telling him that. Defense counsel read a statement by Grandberry from the interview transcript: " 'Nah, it was—it was like—it wasn't fake or nothing, but, you know, it was fucked up. It wouldn't fire and shit, I guess.' "

That matters little to our analysis. There's no evidence the victims knew Grandberry's gun was "not functional." Grandberry used his gun, for example, to force Moore out of the car—after Grandberry tapped on the driver's side window with the gun—and forced Moore into the trunk.

relevant to the required mens rea and weigh in favor of the trial court's finding, even if they are not dispositive. (See generally *Scoggins*, *supra*, 9 Cal.5th at p. 682 [anyone who plans or participates in armed robbery anticipates lethal violence might be used, given that one in 200 armed robberies results in death, even though that alone does not establish reckless indifference to human life]; see, e.g., *People v. Bradley* (2021) 65 Cal.App.5th 1022, 1033 [personally wielding gun during robbery reflects reckless indifference to human life]; *People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1089 [defendant enabled murder by using gun to keep victims at bay during robbery].)

As for Grandberry's knowledge of the likelihood that Appleberry would kill Hawkins, Grandberry testified at his parole hearing that he joined the East Coast Crips when he was 13 or 14, and Appleberry was a fellow member of the gang. When asked if he and Appleberry were a "couple of the most violent guys in that gang," Grandberry replied, "At one time, I would've taken that as a compliment." On the night in question, Grandberry and his two cohorts discussed what to do with Hawkins and Moore, who were witnesses to the robbery of Moore. As the trial court noted, Appleberry was especially concerned about the witnesses, as Hawkins had mentioned an acquaintance they had in common. Appleberry told Grandberry, "[H]omeboy got to go . . . . She [referring to Hawkins] got to go." Grandberry said he "figured" Appleberry would "just take her somewhere" "and tell her to get the fuck out of Dodge." But— after Grandberry already had seen Brookins shoot Moore in the back of the head—when Appleberry then took Hawkins out into a "lone field," Grandberry must have known Appleberry intended

19

to shoot Hawkins.  He admitted as much, stating under oath, "I was fully aware" she was going to be shot.

      b.     *Duration of the crime*

      The series of crimes in this case that culminated in Hawkins' murder went on for hours.  After Grandberry and Brookins decided to do a "lick," they procured weapons and Appleberry—also armed—joined them.  The three men then went to a park where they found the victims and—rather than simply carjacking them and leaving them in the park—decided to take the victims with them.  While the precise sequence of events isn't entirely clear, Grandberry and his cohorts went to the "secluded" area of an apartment building, drove around West Los Angeles, stopped at Clark's house, drove to Hollywood, stopped at Fremont High School, and then went again to Watts.

      Moreover, Grandberry and his cohorts kidnapped the victims and restrained them:  Moore in the trunk and Hawkins in the back seat of the car.  "Where a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, 'there is a greater window of opportunity for violence' . . . , possibly culminating in murder." (*Clark, supra*, 63 Cal.4th at p. 620; see *People v. Montanez* (2023) 91 Cal.App.5th 245, 283.)

      c.     *Efforts taken to minimize the risk of violence*

      In *Emanuel*, our Supreme Court cautioned against "conflat[ing] this *Clark* factor with the factor concerning physical presence at the scene and opportunity to restrain confederates or aid victims." (*Emanuel, supra*, 17 Cal.5th at p. 887.)  The court explained, "Efforts at the planning stage to minimize the potential for violence . . . are viewed as a distinct factor from efforts to restrain confederates once the felony is underway."

20

(*Id*. at pp. 887–888.)  The court noted in *Scoggins* it "recognized that the need to minimize the risk of violence is ' "less pressing" ' when the planned crime does not involve ' "the use of weapons." ' " (*Emanuel*, at p. 887, quoting *Scoggins*, *supra*, 9 Cal.5th at p. 683.)

Here, the planned crimes—which consisted of a plan to steal or carjack a car and then to use that car to drive to stores to rob them—certainly did involve the use of firearms.  Beyond Grandberry's and his cohorts' desire to get money from the robberies—which they planned to commit using guns—the record does not reveal any further conversations or plans about "the risk of violence" inherent in that conduct.

   d.    *Grandberry's physical presence at the scene and*
          *opportunity to restrain confederates or aid victims*

Grandberry was present throughout, for hours, at all of the "scenes" where this series of crimes took place, with the exception of Appleberry's ultimate execution of Hawkins in the field.  Grandberry and Brookins planned to do a "lick"; they procured weapons; joined by Appleberry, they went to the park where they found the victims sitting in their car; they essentially carjacked and kidnapped the victims; they stopped at an apartment building; they robbed Moore; they took turns sexually assaulting Hawkins; they drove to Hollywood; after Brookins shot Moore in the head and left him on the grounds of a school, they drove to Watts where Appleberry shot Hawkins; then—now free of the two potential witnesses—they committed several robberies.

Quoting *Clark*, in *Emanuel* our high court stated, " 'Proximity to the murder and the events leading up to it may be particularly significant where . . . the murder is a culmination or a foreseeable result of several intermediate steps, or where

21

the [co]participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force. In such cases, "the defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state. . . . [Moreover,] the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts." ' " (*Emanuel*, *supra*, 17 Cal.5th at p. 889, quoting *Clark*, *supra*, 63 Cal.4th at p. 619.)

Grandberry testified at his parole hearing that, after Brookins shot Moore and they went back to Watts, he was "fully aware" that Hawkins was going to be shot. When Appleberry shot Hawkins, Grandberry was "in the area," "very close." As the trial court noted, Grandberry had ample opportunity to call for help (for example, when he went to the bathroom at the apartment complex and then returned to the car) or simply to leave. Instead, eager to get to the whole point of the exercise —robberies—he stayed with the two men he later described as his "crimies" even after they shot both victims. (See *Nieber*, *supra*, 82 Cal.App.5th at pp. 478–479 [defendant present at robbery; didn't intervene to prevent murder]; *In re McDowell* (2020) 55 Cal.App.5th 999, 1014 [defendant "was present when the violence ensued but took no steps to prevent it"]; cf. *Scoggins*, *supra*, 9 Cal.5th at p. 678 [defendant, who remained at nearby gas station during the course of the crime, "was not in a position to restrain" the shooter].)

e.  *Totality of the circumstances*

The facts in *Emanuel*—our Supreme Court's most recent discussion of "reckless indifference to human life"—could not be more different from the facts here. There, the defendant "did not use a gun or other weapon during the robbery," and there was

22

no evidence that—before the robbery—the defendant knew his cohort " 'possessed a gun, would bring that gun to the robbery, or "was likely to use lethal force." ' " (*Emanuel*, *supra*, 17 Cal.5th at p. 885.) Here, Grandberry had a gun and he knew both of his cohorts did. He used his gun to force Moore into the trunk. He saw Brookins shoot Moore in the head. By the time they got to Watts, Grandberry knew Appleberry—who, speaking of Hawkins, said " 'she got to go' "—was likely to use lethal force.

In *Emanuel*, the duration of the contact among the victim, the defendant, and his cohort was " 'likely not more than 12 minutes,' " and "the duration of the violent contact . . . was 'presumably even less than that.' " (*Emanuel*, *supra*, 17 Cal.5th at p. 886.) Here, the crimes lasted for hours. The *Emanuel* court noted, "A lengthy interaction between perpetrators and victims of a felony may increase the risk of resistance, conflict, and violence." (*Ibid*.) Quoting *Clark*, the court continued, " 'Courts have looked to whether a murder came at the end of a prolonged period of restraint of the victims by defendant. . . . Where a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, "there is a greater window of opportunity for violence" . . . , possibly culminating in murder.' " (*Emanuel*, at p. 886, quoting *Clark*, *supra*, 63 Cal.4th at p. 620.)

In *Emanuel*, the defendant's plan was "to commit an unarmed robbery of a marijuana dealer at a public park in the middle of the afternoon." (*Emanuel*, *supra*, 17 Cal.5th at p. 889.) "The shooting occurred in the afternoon in a residential area adjacent to a public park. The sound of the gun firing was followed immediately by screeching tires and the collision of [the victim's] truck with a tree. . . . [N]umerous witnesses

were nearby and heard the commotion, and at least two of them called 911." (*Id*. at p. 894.) Here, the series of crimes took place at night into the wee hours of the morning. The perpetrators kidnapped the victims from a deserted park and drove them to a "secluded" area in or near an apartment complex. There, they robbed Moore and raped and sexually assaulted Hawkins. Moore was shot on or near the grounds of a high school—again, presumably deserted in the middle of the night—and left for dead. Hawkins was taken into a "lone field" and executed; her body wasn't discovered until some nine hours later.

Finally, Grandberry contends the trial court erred in "finding that [his] youth did not factor into his participation in the crimes." Grandberry says "there was evidence to support both impulsivity and the presence of peer pressure." We disagree.

Courts have recognized that, "when conducting an analysis of major-participant and reckless-indifference findings" under *Banks*, *supra*, 61 Cal.4th 788 and *Clark*, *supra*, 63 Cal.4th 522, a defendant's youth is relevant. (*People v. Oliver* (2023) 90 Cal.App.5th 466, 486–488. See *In re Moore* (2021) 68 Cal.App.5th 434, 451–454 [hallmarks of youth—immaturity, impetuosity, and failure to appreciate risks and consequences—germane to mental state]; *People v. Jones* (2022) 86 Cal.App.5th 1076, 1091–1093 [remanding case for trial court to consider defendant's youth as part of the totality of the circumstances]; *People v. Pittman* (2023) 96 Cal.App.5th 400, 417–418 [defendant's youth is relevant to the determination of whether the defendant acted with conscious disregard for human life].)

The trial court's written memorandum of decision here demonstrates the court carefully considered Grandberry's youth.

24

The court cited the relevant cases and discussed the declaration the defense had submitted from a psychologist, K. Droit Gaines. The court acknowledged Grandberry had had a "traumatic upbringing": when he was four years old, police kicked in the door of his home and arrested his mother, who was a heroin addict. Nevertheless, the court concluded the *Banks* and *Clark* factors "far outweigh[ed] the effect [Grandberry's] youthfulness and trauma had on his actions." The court found Grandberry made an " 'intentional and volitional choice' " to participate in the crimes "from beginning to end" and " 'to take a calculated risk' " that someone would not be killed. That risk, however, " 'failed to turn out as he had hoped.' "

Substantial evidence supports the trial court's conclusion. While Grandberry told Johnston he'd asked the others " 'what's happening,' " adding " '[a]ll we need is the mother fucking car,' " Grandberry's arguments with his cohorts seem to have been less about the risk to the victims than a concern about the delay in getting on with the robberies. In his words, his "whole thing was, I want to do robberies[,] man. I want some money." As for his discussion with his cohorts, Grandberry explained, "[I]t was two to one, you know. So I just said, fuck it."

Grandberry has cited no evidence that either Appleberry or Brookins threatened him or demanded he participate—or continue to participate—in the crimes. After Appleberry and Brookins used their guns to dispose of both witnesses to the kidnapping, robbery, rape, and sexual assault, Grandberry stayed with them to commit several robberies. All three of the perpetrators were the same age. (Compare *People v. Keel* (2022) 84 Cal.App.5th 546, 550, 562 [15-year-old who participated in crime of opportunity in which 18-year-old shot and killed victim

was "especially vulnerable to outside pressures" as younger gang member who was expected to do the bidding of older gang members]; *In re Moore*, *supra*, 68 Cal.App.5th at p. 454 [16-year-old lacked the experience, perspective, and judgment to appreciate adequately the risk of death his criminal activities posed] with *Mitchell, supra,* 81 Cal.App.5th at p. 595 ["every 18 year old understands bullet wounds require attention"; fact of youth cannot overwhelm all other factors]; *In re Harper* (2022) 76 Cal.App.5th 450, 453, 472 [16-year-old who carried one accomplice's shotgun and helped the other find a knife "did not act like an immature, naïve, or impulsive adolescent"].)

This is not a close case. The record amply supports the trial court's finding that Grandberry acted with reckless indifference to human life and therefore is ineligible for relief under Senate Bill 1473.

As we conclude Grandberry was a major participant in the underlying felonies who acted with reckless indifference to human life, we need not address his contention that the trial court erred in finding he directly aided and abetted Appleberry's murder of Hawkins.

## DISPOSITION

We affirm the superior court's order denying Ernest Rondell Grandberry's petition for resentencing under section 1172.6.

**CERTIFIED FOR PUBLICATION**


                                        EGERTON, J.

We concur:



EDMON, P. J.



HANASONO, J.

27